# In The Circuit Court
## For Montgomery County, Maryland

| | | |
|---|---|---|
| **BARBARA A. GIBBS,** | ) | |
| **MELVIN E. GIBBS** | ) | |
| 4257 Monterey Drive | ) | |
| Florence South Carolina 29501, | ) | |
| **and DOES 1-200,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 405624-V |
| | ) | |
| **BANK OF AMERICA, N. A.,** | ) | |
| **d/b/a SOUTH STATE BANK** | ) | |
| 101 Tryon Street | ) | |
| Charlotte, North Carolina 28255 | ) | |
| **NATIONSTAR MORTGAGE,** | ) | |
| 8950 Cypress Waters Boulevard | ) | |
| Coppell, Texas 75019, | ) | |
| **URBAN SETTLEMENT SERVICES,** | ) | **Demand for Jury Trial** |
| **d/b/a URBAN LENDING SOLUTIONS** | ) | |
| 1001 Liberty Ave | ) | |
| Pittsburgh, PA 15222, | ) | |
| **JEFFREY NADEL, ESQ.** | ) | |
| 4041 Powder Mill Road, Suite 415 | ) | |
| Calverton, MD 20705, | ) | |
| **DOE #1, NOW KNOWN AS:** | ) | |
| **ATLANTIC LAW GROUP, LLC** | ) | |
| P.O. Box 2548 | ) | |
| Leesburg, Virginia 20177, | ) | |
| **DOE #2, NOW KNOWN AS:** | ) | |
| **MONTGOMERY VILLAGE** | ) | |
| **FOUNDATION, INC.** | ) | |
| 10120 Apple Ridge Road | ) | |
| Montgomery Village, Maryland 20886-1000,) | | |
| **DOE #3, NOW KNOWN AS:** | ) | |
| Brian E. Frosh, Attorney General | ) | |
| Office of the Attorney General | ) | |
| 200 St. Paul Place | ) | |
| Baltimore, MD 21202, | ) | |

**and DOES, 4-10,**                )
                                   )
                    Defendants.    )
_____ )

## AMENDED COMPLAINT

### JURISDICTION AND VENUE

I.     Pursuant to the Court's Order dated March 03, 2016.

II.     This Court also has jurisdiction and/or original federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968; and conspiracy 42 U.S.C. §§ 1983, 1985 and 1986.

III.     This action seeks money damages and equitable relief, and is brought under the common law, federal laws and the laws of the State of Maryland, negligence, breach of contract, conspiracy and racketeering.

### I.    INTRODUCTION

1.     When President Obama announced HAMP on February 18, 2009, he described it as a plan to eliminate a "maze of rules and regulations" in which homeowners rarely find answers, and in which "your ability to restructure your loan depends on where you live, the company that owns or manages your loan, or even the agent who happens to answer the phone on the day that you call." The president announced that HAMP "establishes clear guidelines for the entire mortgage industry that will encourage lenders to modify mortgages on primary residences.... This will enable as many as 3 to 4 million homeowners to modify the terms of their mortgages to avoid foreclosure.

~ 2 ~

The president described the shared responsibility under HAMP as follows:

this will require both buyers and lenders to step up and do their part, to take on some responsibility. Lenders will need to lower interest rates and share in the costs of reducing monthly payments in order to prevent another wave of foreclosures. Borrowers will be required to make payments on time in return for this opportunity to reduce those payments. Borrowers will be required to make payments on time in return for this opportunity to reduce those payments.[1]

2.      In early 2009, Bank of America ("BOA") took more than $45 billion in Government bailout money. As a condition of receiving this bailout, BOA agreed to participate in the Home Affordable Modification Program ("HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers. BOA signed a contract with the U.S. Treasury on April 17, 2009 agreeing to comply with the HAMP requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines.

3.      The HAMP program is administered by the U.S. Treasury Department ("Treasury"). All banks participating in the Troubled Asset Relief Program ("TARP") were required to participate in HAMP, while other banks could participate voluntarily.[2] BOA accepted over $45 billion in TARP bailout money.[3] BOA thus signed a "Servicer Participation Agreement" with Treasury to participate in HAMP at its outset in April 2009.[4] As with all participating servicers, BOA was required to solicit

---

[1]      Remarks by the President on the Home Mortgage Crisis, February 18, 2009; available at http://www.whitehouse.gov/the-press-office/remarks-president-mortgage-crisis

[2]      FED. RESERVE BANK OF ATLANTA ECON. REV., No. 2, at 6 (2010).

[3]      Officer of the Special Inspector General for the Troubled Asset Relief Program, Initial Report to the Congress, Feb. 6, 2009, http://www.sigtarp.gov/Quarterly%20Report/SIGTARP_Initial_Report_to_the_Congress. pdf, at 70.

[4]      *Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation*

certain borrowers to apply for HAMP assistance.[5]

4.      Though BOA accepted billions of dollars and contractually agreed to comply with the HAMP directives and extend loan modifications to eligible homeowners, BOA has systematically and deliberately worked to sabotage HAMP and to modify as few mortgages as possible according to its terms. BOA found it was more profitable if homeowners accepted in-house modifications rather than the loan modifications mandated by the HAMP process. Consequently, BOA pushed homeowners who were applying for HAMP modifications toward more expensive in-house modifications and/or refused to provide modification applications using tactics of outright fraud.

5.      Rather than working diligently to reduce the number of loans in danger of default by establishing permanent modifications, BOA serially strung out, delayed, and otherwise hindered the modification processes that it agreed to facilitate. BOA's delay and obstruction tactics have taken various forms with the common result that homeowners with loans BOA serviced, and who met the requirements for participation in HAMP, did not get a fair opportunity to secure a permanent loan modification through the HAMP process.

6.      To accomplish its objectives, BOA created a widespread RICO enterprise to defraud homeowners who sought modifications and then acted as the kingpin of that enterprise. BOA enlisted Defendants Nationstar Mortgage, and Urban Settlement Services (d/b/a Urban Lending Solutions, referred to hereinafter as "Urban") to act as a member of the RICO enterprise and assigned

---

*Agreement,*http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/housing/**mha/Documents_Contracts_ Agreements/093010bankofamericahomeloansSPA(incltransmittal)-r.pdf;** *Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement,* http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/housing/mha/Documents_Contracts_Agreements/Bank%20of%20America%20NA.pdf.

[5]      U.S. Department of Treasury, *Making Home Affordable, Supplemental Directive 10-02*, Mar. 24, 2010 ("SD 10-02"), at 2-3.

to key aspects of the process of administering HAMP, including interacting with homeowners seeking HAMP modifications, collecting and processing documents from homeowners, and corresponding with homeowners.

7.      BOA assigned to Nationstar and Urban key aspects of conspiracy, including acquiring mortgages of HAMP applicants, foreclosing on HAMP applicants, collecting and processing documents from homeowners, and corresponding with homeowners.

8.      BOA, Nationstar, Urban, and [Does] not known to Plaintiffs, worked in concert, under BOA's direction for many years, to frustrate the HAMP process and to prevent as many homeowners as possible from obtaining permanent loan modifications that complied with HAMP while allowing BOA to maintain the appearance to regulators and the public of trying to comply with its HAMP obligations. Through this relationship and with this common goal, BOA, Nationstar, Urban, and [Does] not know to Plaintiffs, formed an association-in-fact enterprise that was effectuated through the use of thousands of false wire and mail communications. As part of the scheme "site leaders" were told BOA would collect more money if HAMP modifications were delayed/denied and, as such, BOA employees were instructed to delay/deny HAMP modifications.

9.      Plaintiffs and "others" were led to believe that they were dealing with BOA when secretly they were communicating with Nationstar, or others. As part of the loan-modification scheme and enterprise, Urban, and Nationstar became "black holes" for documents sent by homeowners. As part of the enterprise and scheme, BOA used the mail and wires to falsely deny modifications by claiming that information required of homeowners seeking a HAMP modification had not been received, when in fact BOA, Urban and Nationstar had received the documents.

~ 5 ~

Oftentimes consumers were led to believe they were speaking with BOA's "Office of the President" when in fact they were speaking with Urban or Nationstar employees. As part of the scheme Urban and Nationstar employees manipulated financial records to justify ending the HAMP modifications process for homeowners.

10.    Numerous former employees of both BOA, Nationstar and Urban report that BOA directed its employees and contractors to use the wires and mails to deliberately lie to homeowners who were in the process of trying to obtain loan modifications under HAMP. They further report a widespread and deliberate practice of knowingly issuing false notices claiming that homeowners had failed to submit required documentation and of denying HAMP applications en masse for reasons they knew to be false. These actions were taken with the full knowledge, and at the direction, of the individuals tasked with running Defendants' HAMP modification program.

11.    This scheme was conducted via interstate mail and phone lines, in thousands of documents sent via mail and overnight courier, including documents and phone calls intended to deceive Plaintiffs and borrowers into believing they would receive HAMP modifications, and letters and phone calls which were knowingly false about why borrowers were not receiving HAMP modifications.

12.    Because of the BOA, Urban, Nationstar and Does not known to Plaintiffs, hundreds of thousands of homeowners were wrongfully being deprived of an opportunity to cure their delinquencies; [Plaintiffs] pay their mortgage loans and save their homes. By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury, and the terms of the contracts it formed with individual homeowners, BOA has left thousands of borrowers in a state of limbo – often worse off than they were before they sought a modification

from BOA.

13.     [*On behalf of nationwide classes of borrowers*], Plaintiffs state a cause of action

under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) & (d), alleging

that Defendants created an association-in-fact enterprise designed to mislead and deceive borrowers

through use of the United States mail and wires. On behalf of the members of those classes, Plaintiffs

seek declaratory relief and/or a judgment of liability.

14.     In addition, on behalf themselves and statewide classes of similarly situated

borrowers, Plaintiffs state claims of promissory estoppel for representations made to them by

Defendants.

**III. PARTIES**

15.     Individual and Representative Plaintiff Barbara A. Gibbs is a resident of the state of

Maryland [Georgia].

16.     Individual and Representative Plaintiff M. Eugene Gibbs-Squires and Barbara A.

Gibbs are husband and wife and are residents of the State of Georgia.

17.     Defendant Bank of America, N.A., is a mortgage lender with headquarters at 101

Tryon Street, Charlotte, North Carolina 28255. Bank of America, N.A., performs substantial

business within the state of Maryland. Bank of America N.A. has formerly done business under the

name BAC Home Loans Servicing, LP, which was formerly a subsidiary of Bank of America, N.A.

and is now a successor by merger; and Bank of American may have merged with or transferred a

majority of [i]ts business to South State Bank.

18.     Defendant Nationstar Mortgage is a limited liability corporation with its headquarters at 8950 Cypress Waters Boulevard, Coppell, Texas 75019; organized under the laws of Texas and which does business throughout the United States.

19.     Defendant ATLANTIC LAW GROUP, LLC, P.O. Box 2548, Leesburg, Virginia 20177; organized under the laws of Virginia and which does business throughout the United States.

20.     Defendant **MONTGOMERY VILLAGE FOUNDATION, INC.,** 10120 Apple Ridge Road, Montgomery Village, Maryland 20886-1000; organized under the laws of Maryland and which does business in Maryland.

21.     Defendant Brian E. Frosh, Attorney General, 200 St. Paul Place, Baltimore, MD 21202, is an agency of the State of Maryland.

22.     Defendant Urban Settlement Services d/b/a Urban Lending Solutions is a limited liability corporation with its headquarters at: 1001 Liberty Ave, Pittsburgh, PA 15222, organized under the laws of Pennsylvania with main offices located in Broomfield, CO and which does business throughout the United States.

23.     At all times herein mentioned, Defendants Bank of America, N.A., and BAC Home Loans Servicing, LP, and all Defendants, individually and collectively, are and were agents and/or joint ventures of each other and, in doing the acts alleged herein, were acting within the course and scope of such agency. Collectively, these Defendants combined and conspired with each "BOA" [Hereinafter (The HAMP-less Gang)].

**CLASS ACTION - Maryland Rule 2-231**

    **A.      BOA assigned key HAMP functions to third parties such as Urban, SLS and others.**

24.     In order to appear to be compliant with HAMP, BOA contracted with third parties to provide HAMP-related services. BOA controlled and closely supervised these third parties: Nationstar and Urban. AND;

a.      BOA directed JEFFREY NADEL, ESQ, ATLANTIC LAW GROUP, LLC, and MONTGOMERY VILLAGE FOUNDATION, INC., to file frivilious law suits against Plaintiffs to "steal" Plaintiffs' homes, exhaust Plaintiffs funds and thus prevent any and all recourse to Plaintiffs. SIMILARLY,

(1)     BOA entered into a consent agreement designed to pay moneys to the Maryland Attorney General for the sole purpose of the AG turning a "Blind Eye" to BOA's continued conspiracy and racketeering in defrauding HAMP.

25.     BOA identified Nationstar and Urban as participants and members of an enterprise whose purpose was to create a phony front whereby BOA would offer borrowers the opportunity to receive a HAMP modification and thereby induce their response, but then reject a HAMP modification based on fraudulent pretenses of Plaintiffs' and a homeowner's non-compliance.

26.     BOA assigned Nationstar and Urban specific tasks, and structured the arrangement so that BOA received daily, or even hourly, updates on everything Nationstar and Urban was doing with regard to HAMP. Nationstar, Urban and BOA interacted in a close relationship over which BOA maintained strict and meticulous control. BOA created this close contractual relationship in order to ensure that Nationstar and Urban would participate in the loan-modification scheme and work with BOA in an enterprise that has a common goal of reducing the number of HAMP modifications issued to borrowers.

~ 9 ~

27.     Among other things, BOA assigned Urban, Nationstar and others to analyze the data in a "pool" of loans to determine the preferred modification program based on BOA criteria and perform quality control on the data. Using BOA's criteria; Nationstar and Urban was to decide which modification program was appropriate." Often, this involved shifting a borrower who applied for a HAMP modification into a less advantageous, internal, BOA modification that would be more profitable for BOA.

28.     Urban, Nationstar and others were to receive, track, and perform quality control on financial documents sent by customers. It was to upload the documents to a web-based share-point site where it could be viewed by BOA.

29.     BOA, Urban, Nationstar and others' employees reported the problems in the HAMP modification process on multiple occasions to BOA, Nationstar and Urban executives including Tyrone Wells, Troy Novotny, Kenneth Scheller, Robert Nicholson, Rebecca Mairone, David Swain, Patricia Feltch, Jinja Martin, and John Beranich. These were the executives and employees designated by BOA, Nationstar and Urban to oversee BOA and Urban's HAMP loan-modification efforts. Urban's performance did not improve and there were no efforts by BOA to change Urban's conduct or performance. Similarly, there were no substantial efforts by BOA to bring its own performance into compliance with reasonable business practices or to remediate the harm its failings caused hundreds of thousands of its customers. Both BOA and Urban continued on the same path, despite having full knowledge that it meant borrowers would be wrongfully denied, or delayed in getting, permanent modifications.

**B.     BOA directed and encouraged Urban, Nationstar and others to fraudulently deny loan modifications.**

30.     By secretly directing borrowers to return documents to Urban's, Nationstar's and others' locations, BOA used Urban, Nationstar and others as a repository for borrower documents. In actual practice, and according to former Urban employees including Gregory Mackler and Bert Sheeks, along with former BOA supervisors Steven Cupples and William Wilson, BOA designed Nationstar and Urban to serve as a "black-hole" for the documents borrowers sent in the course of trying to obtain permanent loan modifications. The manner in which BOA set up and directed Urban's, Nationstar's and others' processes guaranteed that the vast majority of Trial Period Plan Agreements would not be converted to permanent modifications in the time contemplated by the Trial Period Plan Agreements and by HAMP.

31.     At BOA's direction, Urban, Nationstar and others delayed forwarding modification packages to underwriting for months and instead noted on the computer system that documents were incomplete despite the fact that borrowers had provided all required documents. Customers regularly heard nothing from BOA for months after sending in their documents and making their required trial payments. When borrowers finally called to inquire as to the status of their modification, they were falsely strung along and told their loan was in process. Eventually most borrowers were falsely told that their file remained incomplete and that they were required to send in additional documents. Typically communications were over the phone, and were knowingly and intentionally deceptive in light of BOA and Urban's, SLS's and others' overall loan-modification scheme.

32.     According to former Nationstar and Urban employees including Gregory Mackler, Urban hired hundreds of new employees – many with no qualifications and little training, in an effort to reduce the number of outstanding service requests. Urban employees were shown formulaic methods by which to close service requests. These methods included closing a service request (and

therefore ending the HAMP process for the borrower) based on a "Missing Information Letter" or "Incomplete Information Notice" directed to the borrower in the electronic file. Bert Sheeks has testified that Urban employees were encouraged to close files simply by seeing such a notice in the electronic system without researching whether the notice was accurate or whether the borrower responded to the notice. Urban employees have confirmed that files were routinely closed on a fraudulent basis when it was apparent from the electronic records that the borrower had provided all required information and documents.

33.     Executives at BOA, Urban, Nationstar and others' were fully aware that thousands of borrowers were being wrongfully denied HAMP modifications pursuant to the loan-modification scheme, yet they allowed, encouraged, and directed that the loan-modification scheme should continue unabated.

34.     John Beranich was an Urban vice president who oversaw efforts to comply with BOA's demand to reduce the number of service requests. Several former Urban employees including Gregory Mackler, Elizabeth Farmer, Shane Stahl, and Wesley White informed Beranich that Urban was regularly closing borrower files wrongfully and detailed the ways in which files were being wrongfully closed. Beranich responded by reminding employees who complained that their job was to reduce the number of service requests and that failure to do so could lead to them losing their jobs. On multiple occasions, employees who raised these types of concerns to Beranich were either fired or demoted.

35.     Urban employees who raised concerns to Beranich regarding the propriety of the manner in which service requests were closed were subject to discipline that included demotion or even termination.

~ 12 ~

36.     Robert ("Robbie") Nicholson is a BOA executive who oversaw Urban's efforts to reduce service requests. According to former Urban employee Bert Sheeks, Nicholson was aware of the details of the manner in which Urban improperly closed service requests and that homeowners were being denied modifications and even losing their homes as a result. Nicholson did nothing to remedy these concerns. Instead, Nicholson personally confronted Urban employees who raised concerns and put pressure on the supervisors of those employees to bring them "in line."

37.     Ken Scheller is a BOA Vice President and former executive of Countrywide. Scheller was instrumental in creating and implementing BOA's policies and procedures to process HAMP applications. On multiple occasions, BOA and Urban employees directly informed Scheller that the processes were being administered in a manner that made it impossible for the vast majority of BOA customers to obtain permanent HAMP modifications. Scheller responded by telling at least one Urban employee who was raising concerns that BOA was "not of course interested" in faithfully reviewing modification requests. Scheller directed the employee to "back off" the issue, since raising concerns of this kind was inconsistent with BOA's and therefore Urban's core efforts to decrease HAMP participation.

38.     Rebecca Mairone was a BOA Vice President and a former COO of Countrywide's Full Spectrum Lending division. Mairone was instrumental in creating and implementing BOA's policies and procedures to process HAMP applications, including the extent to which BOA used Urban, SLS and others to implement its HAMP scheme. On multiple occasions, BOA employees and other executives directly informed Mairone that processes and training were inadequate, that error rates were unacceptable, and that, as a result, BOA customers who should have received HAMP modifications were being wrongfully declined and were instead losing their homes. Despite repeated

~ 13 ~

reports, Mairone did not implement remedial measures that could reasonably be expected to be effective, thereby allowing the loan-modification scheme to continue unabated.

39.     David Swain is a BOA Vice President who oversaw BOA's efforts to reduce its backlog of HAMP applications and outstanding trial plans. Swain instituted high pressure initiatives to reduce backlog by declining HAMP applications and trial plans en masse.

40.     According to a former high-level BOA executive, Swain was repeatedly informed from various sources – both verbally and in writing, that reviews and audits showed that BOA's "blitzes" and other mass declination programs were resulting in thousands of homeowners being wrongfully denied HAMP modifications. Swain nevertheless continued with the same projects.

41.     Patricia Feltch is a BOA Vice President and former Countrywide executive. Feltch was instrumental in implementing BOA's policies and procedures to process HAMP applications. On multiple occasions, BOA employees and other executives directly informed Feltch that processes and training were inadequate, that error rates were unacceptable, and that, BOA customers were being wrongfully denied the opportunity to modify their mortgage loans and were instead losing their homes. Feltch was also instrumental in imposing Blitzes and other mass decline efforts. She continued to impose and implement efforts geared to mass declinations despite being specifically informed that thousands of homeowners were being wrongfully denied HAMP modifications as a result.

42.     Nicholson, along with their immediate superiors Tony Meola and John Berens, constituted a control group who designed and implemented BOA's HAMP policies and procedures in a way that deliberately worked to defraud homeowners and to extend as few HAMP modifications as possible while still giving the appearance that BOA was making efforts to comply with HAMP.

**C.     Notices provided by BOA, Urban, SLS and others were fraudulent.**

43.     Defendants knew and intended that they had created a "black hole" for homeowners seeking HAMP modifications, and that the overwhelming majority of applicants would never receive permanent HAMP modifications.

44.     Defendants knew and intended that, as a result of their scheme to delay and wrongfully deny modifications, BOA would not provide permanent modifications under the terms of these contracts to all borrowers who satisfied their obligations. Defendants also knew and intended that the vast majority of borrowers, who sought HAMP modifications, including those who received trial-payment agreements and satisfied their obligations, would instead be fraudulently denied a permanent modification on a falsified basis, or offered a permanent modification that did not comply with the terms of the contract.

45.     BOA, Urban, Nationstar and others sent documents to, and made false statements to, homeowners by means of interstate commerce, including but not limited the mails, telephone lines, email, and the internet. Such communications included letters instructing homeowners as to how to apply for HAMP modification; phone calls in which BOA and Urban employees knowingly misrepresented both the nature of the HAMP modification process and the status of borrowers' loan-modification applications; notices claiming that information or documents were missing; trial-payment; agreements; and notices of denial. Each of these documents were either fraudulent in themselves or sent with an intent to further the enterprise's loan-modification scheme. In the aggregate, Defendants used interstate mail and wire hundreds of thousands (and possibly millions) of times in their loan-modification scheme to make representations that they knew, or would have known but for their recklessness, were deceptive, false, and fraudulent.

~ 15 ~

46.     BOA contracted with other contractors to further its loan modification scheme. These contractors include Sykes Enterprises, Inc. ("Sykes"), who BOA retained to field telephone calls from customers attempting to secure HAMP modifications. The contractors also included Stewart Settlement Services ("Stewart") who BOA retained to mail documents to homeowners seeking HAMP modifications and to receive, compile, and upload documents from homeowners. As with Urban, BOA has closely controlled Sykes' and Stewart's work and performance.

**D.     BOA's Actions Caused Injury to Plaintiffs**

47.     Plaintiffs have suffered injury caused by the scheme, including but not limited to longer loan payoff times, improper negative reporting to credit bureaus resulting in monetary harm due to damaged credit, monetary damages from higher principal balances, inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, increased accrued interest, and wrongful foreclosure.

48.     Further, in many instances, BOA actually encouraged or instructed borrowers to default on their loans in order to "qualify" for assistance, when in fact HAMP requires only that an "imminent risk of default" be attested to. In addition, by complying with the terms of their Trial Period Plans and making lower payments, borrowers have placed themselves at risk of being considered in default, and losing their homes in foreclosure, because they have not made their full mortgage payments.

**V.     CLAIMS OF NAMED PLAINTIFFS**

**A.     Barbara Gibbs and M. Eugene Gibbs**

~ 16 ~

**COUNT I – Unjust enrichment**

49.     Plaintiffs aver and replead paragraphs 1-45.

50.     Plaintiffs Barbara Gibbs and Melvin Gibbs purchased their homes in Florence, South Carolina in March of 2005, and Gaithersburg, Maryland in December 2006. They financed the building of their South Carolina home with a one year construction loan: purchased with a 30-year fixed mortgage from BOA. The loan had a fixed rate of 6.125% and called for monthly payments of $2,009.42. Mr. and Mrs. Gibbs lived in the home [South Carolina] that secured their mortgage as their primary residence. They made all of their mortgage payments in full and on time.

a.     Gibbs believe they are entitled to $75,000, but the amount will be proven at trial.

**COUNT II – Breach of Contract**
**[Implied Covenant of Good Faith and Fair Dealing]**

51.     Plaintiffs aver and replead paragraphs 46-47.

52.     In June 2005, Mrs. Gibbs retired at the age of 62. Mrs. Gibbs' income was reduced by more than 40% – from approximately $105,000 to approximately $60,000 per year. During this period Mr. Gibbs had an income of about $24,000 per year. In or about September 2005, the Department of Labor restored Mr. Gibbs' disability payments: about $36,000 per year; raising Mr. Gibbs' yearly income to about $60,000 per year. However, in or about February of 2009 the Department of Labor penalized Mr. Gibbs about $1,500 per year for two (2) years.

53.     In or about May of 2008, the Gibbs' applied to BOA for loan modifications. BOA approved the modified loans, but only if the Gibbs' paid closing cost of about $30,000. The Gibbs'

~ 17 ~

declined the modified loans. The small reduction in monthly payments would not have allowed the Gibbs to recover the $30,000 over the course of the loan.

54.     On March 6, 2009 via BOA's electronic account contact system, Mrs. Gibbs again complained the $200 application fees ($400.00), the closing fees of $30,000, and the poor treatment of the Gibbs, especially since Mr. Gibbs was a Veteran.

55.     In or about September 2009, Mr. Gibbs heard about the MHA and HAMP programs on the news. He gathered information about the program, and inquired from BOA, by and through their employees, the process of applying for a loan modification under HAMP through Bank of America. BOA's employees were misleading and deceptive, and gave Mr. Gibbs the impression that Gibbs' loans were not covered under the HAMP program(s). These statements by BOA employees were intentionally false and misleading at the time.

56.     The Gibbs continued to contact Bank of America over several months in an effort to request that they be considered for a loan modification under HAMP and were continually given incorrect information or transferred from one employee to another.

57.     On or about July 2011, Gibbs sent BOA a proposal to settle all possible claims arising out of BOA's improper conduct. Including the $16,000 credit card debt BOA was negotiating as part of the HAMP process.

58.     On September 26, 2011, the Gibbs spoke with Rogelio Chua, their first BOA assigned customer relationship manager ("CRM"), who requested the Gibbs submit documents (9 pages) to complete the HAMP application process. On September 28, the Gibbs faxed the completed application along with all the documents requested including a completed and signed Hardship Affidavit, bank statements, pay stubs, their most recent tax return, utility bills, and a completed IRS

~ 18 ~

Form 4506T. As directed, the Gibbs faxed these documents to "Bank of America" to the number provided by Mr. Chua.

59.      On November 11, 2011, Gibbs notified BOA that Mr. Gibbs' cancer surgery and treatment was being conducted at Johns Hopkins Hospital, Baltimore, Maryland, and Mr. Gibbs would be using the property known as: 20105 Torrey Pond Place, Gaithersburg, Maryland 20886, as Mr. Gibbs' primary residence.

60.      When the Gibbs called and inquired about the status of their application, they were repeatedly told that Mr. Chua was "out sick," "on vacation," "no longer employed," or otherwise "unavailable." They left dozens of messages that were not returned. These misleading and deceptive phone conversations were part of Defendants' overall loan-modification scheme, and are typical of what thousands of other borrowers also experienced.

61.      Over the next several months, the Gibbs contacted Mr. Chua at least 1-2 times each week to inquire as to the status of their application. They were repeatedly told, in telephone communications, that their application was "under review" and that they could expect a decision from BOA. These communications were knowingly and intentionally false, and were part and parcel of Defendants' use of the wires to perpetuate a scheme of deception and fraud involving thousands of borrowers like the Gibbs.

62.      The Gibbs was told on at least one occasion that all their documents had been lost and that they would need to re-send them Mr. Hector Prieto. They were also instructed to re-send particular documents they had previously sent. This false and knowing misrepresentation that Defendants had not received, or had "lost," the Gibbs' documents was precisely the sort of misrepresentation Defendants intended to be issued to thousands of borrowers like the Gibbs, by use

of the mails and wires.

63.    On February 03, 2012 and again on July 18, 2012, Gibbs notified Mr. Prieto that Rogelio Chua, CRM was responsible for Gibbs' application. Gibbs also informed Mr. Prieto that Gibbs had been provided no information or incorrect information, and Gibbs had raised the issue of Mrs. Gibbs being "steered" into a predatory loan.

64.    On June 20, 2012, the Gibbs received a letter stating they were not eligible for failure to submit the required documents. The letter also suggested that to avoid foreclosure the Gibbs should consider a Short Sale or Deed in Lieu of Foreclosure. The Gibbs were instructed to re-submit all documents yet again. This knowing, intentional, and deceptive attempt to push the Gibbs out of a HAMP modification, and to require the Gibbs to once again send in documents they had previously sent on multiple occasions, was made pursuant to Defendants' loan-modification scheme and enterprise and was typical of communications made to thousands of other borrowers.

65.    The Gibbs fully complied with each demand that they send in documents and promptly sent the documents BOA requested – even when they had already sent the same documents multiple times.

66.    On February 5, 2012, Gibbs sent Mr. Chua a fax requesting the status of their application, complained of the predatory loan Mrs. Gibbs had been steered into, and attempt to charge the Gibbs $30,000 in settlement fees.

67.    On August 1, 2012 and August 20, 2012, the Gibbs faxed Mr. Chua complaining of the attempts of Mr. Prieto to deny the Gibbs application. Gibbs also informed Mr. Chua that the deliberate delays by BOA was not acceptable.

~ 20 ~

68.     On August 22, 2012, BOA sent Gibbs a letter thanking Gibbs for their patience and assured Gibbs BOA would research Gibbs' case and resolve the issues.

69.     From September 2011 to November, 2012, BOA assigned 2 CRMs to the Gibbs' modification. The vast majority of the Gibbs' attempts to obtain information regarding the status of their modification went unanswered.

70.     On Monday, November 5, 2012 – two and one half months after Bank of America had thanked the Gibbs for their patience and BOA assured Gibbs they would research the case – the Gibbs received a letter informing them that their mortgages had been sold to Nationstar Mortgage and SLS, and that [i]t would no longer be serviced by Bank of America.

71.     The Gibbs learned that Bank of America had transferred their loan without reflecting any modification information and/or negotiations. AND, BOA deliberately "shelled" Gibbs' November 2011 mortgage payment and showed the Gibbs had defaulted on the South Carolina loan. According to Nationstar, the loan is over $13,334.84 in arrears due to yet more interest, fees and costs that HAMP-less Gang added to the loan principal. *The Gibbs is at risk of foreclosure despite never having missed a payment on their mortgage.*

72.     As a result of the enterprise that Defendants created, the Gibbs have not completed the modification process over the past four years; a process that should have taken four months, and they now owe thousands of dollars more on their mortgage.

73.     Defendants repeatedly used mail and wire to issue knowingly false communications to the Gibbs regarding their loan modification and the status of the loan modification, just as Defendants did with thousands of other borrowers pursuant to their loan-modification scheme.

~ 21 ~

a.      Gibbs believe they are entitled to $500,000, but the amount will be proven at trial.

## VII. EQUITABLE TOLLING, DISCOVERY RULE RE: STATUTES OF LIMITATIONS

74.     Any applicable statutes of limitations have been tolled by Defendants' illegal, deceptive, and fraudulent practices. Defendants have concealed from Plaintiffs and the Classes the truth about their illegal, deceptive, and fraudulent practices described herein, thereby tolling the running of any applicable statutes of limitations.

75.     Plaintiffs and [Does] had no knowledge and could not have reasonably discovered Defendants' illegal, deceptive, and fraudulent practices as alleged herein until recently.

76.     Defendants are *estopped* from relying on any statute of limitations defense because of their illegal, deceptive, and fraudulent practices as alleged herein: breach of contract; breach of the implied covenant of good faith and fair dealing; fraudulent misrepresentation; unjust enrichment.

## COUNT III - RICO
[Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(C)]

77.     Plaintiffs aver and replead paragraphs 48-73.

78.     From at least May 6, 2009, to the present, the affiliation between members of the HAMP-less Gang constituted an enterprise. Defendants conducted and participated in that enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (c).

~ 22 ~

79.     The RICO enterprise, which engaged in, and whose activities affected interstate and

foreign commerce, was comprised of an association-in-fact of entities and individuals that included

Bank of America, N.A., and its subsidiary BAC Home Loans Servicing, LP, Urban Settlement

Services, LLC, Nationstar Mortgage, and others along with several of their respective employees and

officers, including John Beranich, Robbie Nicholson, Ken Scheller, Patricia Feltch, Rebecca

Mairone, David Swain, and Jinja Martin.

80.     The members of the RICO enterprise all had a common purpose: to extend as few

permanent HAMP modifications as possible while providing BOA a justification to claim that

borrowers had not fulfilled their trial-payment agreements or were otherwise ineligible for HAMP

modifications. At BOA's direction and with BOA's full knowledge, HAMP-less Gang instructed its

employees to close borrowers' claim modification files without an adequate investigation, thereby

deeming the borrowers to have failed the HAMP modification process, even when it was apparent

from the electronic records that the borrower had provided all required information and documents.

BOA and Urban executives were not only informed that the files were closed without a sufficient

investigation, but actively encouraged or cajoled HAMP-less Gang employees to do so.

81.     The enterprise was also forged by the relationships among those associated with it.

BOA contracted with HAMP-less Gang: members and assigned to it the key aspects of the process of

administering trial plans and providing permanent modifications to borrows who fulfilled the terms

of their trial plans. Through their respective employees, HAMP-less Gang coordinated their activities

to frustrate the HAMP process and limit the number of homeowners who obtained permanent loan

modifications, while maintaining the appearance of compliance to regulators and the public. For

example, BOA directed that HAMP-less Gang employees identify themselves as being from Bank of

America – typically from the "Office of the President." HAMP-less Gang employees were given titles and email addresses suggesting that they were employed by Bank of America to create the false impression to borrowers that they were speaking to and corresponding with BOA when, in fact, they were interacting with HAMP-less Gang employees. BOA set up and directed Urban's processes in a manner that guaranteed that the vast majority of HAMP applicants would not obtain permanent HAMP modifications. As part of the scheme to defraud, HAMP-less Gang became a "black hole" for documents sent the homeowners by, for example, allowing the documents to "age" so that they would not support a permanent modification. For its part, BOA would deny modifications, claiming that the information (which was residing with HAMP-less Gang) had not been received.

82.     This RICO enterprise has remained in existence for several years, enabling its members to pursue the enterprise's purpose. HAMP-less Gang conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that began in 2009 and continues through the present and has consisted of hundreds of thousands (or millions) of acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343.

83.     HAMP-less Gang engaged in a scheme or artifice to defraud borrowers by stalling and hindering the loan modification process and misleading the borrowers to prevent many of the homeowners who are eligible for permanent loan modifications and who have met the requirements for participation in HAMP from receiving the loan modifications to which they are entitled.

84.     HAMP-less Gang were aware of this scheme and actively participated in it by, for example, misrepresenting HAMP-less Gang employees as BOA employees and by establishing delaying tactics that would guarantee that as few borrowers as possible would receive their loan modifications.

~ 24 ~

85.     The U.S. mail or wire services, including internet, telephone and email were used in furtherance of the scheme. Use of the mail or wire services were either known to HAMP-less Gang or it was reasonably foreseeable that they would be used for this purpose.

86.     Defendants' repeated violations of the federal mail and wire fraud statutes, which have all occurred in the last few years, include:

a.     Providing instructions over the internet as to the steps a homeowner would need to take to secure a permanent loan modification under HAMP with the knowledge and intent that it would induce homeowners to act in expectation, even though Defendants did not intend to follow the steps stated on their website that would enable homeowners who fulfilled all requirements to obtain a permanent HAMP loan modification.

b.     Sending instructions to Plaintiffs and other homeowners by mail, fax, email or internet directing them to provide documents and other information to be considered for a HAMP loan modification, with the knowledge and intent that it would induce homeowners to act in expectation, even though Defendants did not intend to enable homeowners who fulfilled all requirements to obtain a permanent HAMP loan modification.

c.     Informing thousands of homeowners by mail, fax, telephone and/or email that their applications were on hold, or that they would not receive a permanent modification, because they had not provided necessary financial documents, when in fact Defendants knew that the homeowners had provided the documents.

d.     Informing thousands of homeowners by mail, fax, telephone and/or email that their applications were on hold, or that they would not receive a permanent modification, because their financial information was not timely, even though Defendants knew that the documents were

~ 25 ~

timely when the homeowners provided them.

     e.    Intentionally providing thousands of homeowners who applied for HAMP loan modifications, and who were qualified to receive HAMP modifications, with in-house loan modifications that were less advantageous to homeowners but more profitable to BOA.

87.    The scheme to defraud that was perpetrated by BOA and Urban and their employees and which was at the center of the racketeering activity, involved issuing trial-payment agreements to thousands of eligible applicants, when BOA intended to deny the vast majority of those agreements: including Plaintiffs' on entirely false grounds.

88.    As part of and in furtherance of the scheme to defraud, HAMP-less Gang would receive documents and information from Plaintiffs and others by mail, fax, telephone and/or email from homeowners fulfilling their Trial Period Plan Agreements and intentionally delay acting on the documents for several months.

89.    As part of and in furtherance of the scheme to defraud, HAMP-less Gang would receive documents and information by mail, fax, telephone and/or email from Plaintiffs and homeowners and intentionally fail to record receipt of the documents on electronic systems or to convey the modification package to underwriting for months and often not until the documents had aged beyond the point that they could be used for underwriting.

90.    As part and in furtherance of the scheme to defraud, Nationstar, Urban and BOA intentionally manipulated and falsified data on customers' electronic files so that files could be closed and modification applications rejected.

91.    As part of and in furtherance of the scheme to defraud, HAMP-less Gang would send Plaintiffs' and borrowers' notices by mail, fax, telephone and/or email that information or

~ 26 ~

documentation was missing from the homeowners' modification files when Urban and BOA knew that the homeowners had provided the information.

92.     As part of and in furtherance of the scheme to defraud, HAMP-less Gang regularly sent Plaintiffs and customers notices of denial by mail, fax, telephone and/or email that HAMP-less Gang knew to be based on reasons that were untrue.

93.     As part of and in furtherance of the scheme to defraud, HAMP-less Gang employees falsely held themselves out to BOA customers: including Plaintiffs and to the public by mail, fax, telephone and/or email as being employees and executives of BOA and gave homeowners the false impression that they were speaking to and corresponding with BOA executives from the "Office of the President."

94.     These thousands of violations constitute a pattern of racketeering. They are related in that they share the same purpose of defrauding homeowners; involve the same participants, victims, and methods of commission. And because defendants' large-scale criminal activities occurred over a period of several years and are continuing unabated, they amount to or pose a threat of continued criminal activity.

95.     Each of the defendants associated with the RICO enterprise knew of existence of the enterprise and its related activities. BOA, through its designated officers and employees, devised the loan-modification scheme and coordinated with Urban to carry it out. Individual defendants oversaw, directed, and managed various aspects of the scheme, including authorizing HAMP-less Gang employees to employ unscrupulous methods to reduce the number of borrowers who would be granted loan modifications and reprimanding those employees who objected.

96.     HAMP-less Gang and their employees conducted and participated in the affairs of the RICO enterprise through a pattern of racketeering activity. Each of the defendants participated in the enterprise's decision-making or were plainly integral to carrying out the scheme to defraud. Specifically, BOA through its employees, including Scheller, Mairone, Nicholson, Martin, Feltch, and Swain, set up the process for approving the loan modifications to ensure that the vast majority of applications would not result in permanent modifications in the time contemplated by HAMP. BOA and its officers and employees, including Nicholson and Scheller, supervised Urban and coordinated with Urban and its officers and employees, including Beranich, to ensure that the processes were carried out according to plan.

97.     As part of their participation, HAMP-less Gang knowingly and intentionally sent, mailed, and transmitted or caused to be sent, mailed, or transmitted fraudulent solicitations, instructions, and Trial Period Plan Agreements in interstate or foreign commerce. These fraudulent documents constituted numerous and repeated violations of the federal mail and wire fraud statutes in violation of 18 U.S.C. §§ 1341, 1343, as well as a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961 (1), 1962 (c). Defendants knew, or at a minimum were reckless in not knowing, that the documents were misleading, deceptive, and/or false when sent, as a result of the actions of their officers and employees pursuant to the loan-modification scheme outlined in this Complaint.

98.     In addition, HAMP-less Gang sent, mailed and transmitted or caused to be sent mailed or transmitted, in interstate or foreign commerce, notices containing false and fraudulent information pertaining to the status of Plaintiffs' and borrowers' efforts to obtain a permanent loan modification under HAMP to Plaintiffs and to thousands. These fraudulent notices constituted numerous and repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341,

~ 28 ~

1343, as well as a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(1), 1962 (c). By reason of their conduct and participation in the racketeering activity, Defendants caused damages to Plaintiffs and to members of the National RICO Class.

## COUNT IV - Conspiracy
[Common Law and 42 U.S.C. §§ 1983, 1985 and 1986]

99.     Plaintiffs aver and replead paragraphs 48-95.

100.    Plaintiffs' letter dated the 26th day of July 2013, notified Defendants that their actions had no basis in fact or law and that Bank of America were engaged in racketeering. Plaintiffs put Defendants on notice Plaintiffs had not default of their South Carolina mortgage.

101.    Plaintiffs discovered Defendants filed a foreclosure action in South Carolina; Plaintiff, Melvin Gibbs called Defendants on October 28, 2013 and informed them the suit constituted fraud on the court.

102.    The HAMP-less Gang served pleadings on Plaintiffs on or about November 6, 2013. Plaintiff, Melvin Gibbs, immediately called and informed the HAMP-less they had perjured themselves, to wit:    Plaintiff had never missed a mortgage payment; and would provide bank records certifying that each and every mortgage payment had been made to their client, Nationstar.

103.    Plaintiffs ***have not*** defaulted on their mortgage: Plaintiff provided proof positive, evidencing each and every mortgage payment over the "claimed" year of default-August 2013, and the preceding year, 2012. The HAMP-less Gang by sworn complaint, alleged Plaintiffs defaulted on August, 2013. AND,

104.    The HAMP-less Gang also swore Plaintiffs had not made application for a mortgage modification under HAMP. Plaintiffs by clear, convincing and certified documents provided proof positive Plaintiffs made application for mortgage modification under HAMP.

105.    The HAMP-less Gang's illegal acts include but are not limited to filing foreclosure suit against Plaintiffs, *only* evidenced by a mortgage; the NOTE being missing. The Supreme Court decision "clearly supports the notion that the Plaintiff must own the **Note** and **Mortgage** at the time the Complaint is filed; an issue settled 143 years ago. [ **Carpenter v. Longen**, 83 U.S. 271, 16 Wall. 271, 21 L. ed. 313 (1872)].

106.    Unless a claimant can colorably assert a loss, it lacks standing: Plaintiffs proved they made every payment. [*See*, **Lujan v. Defenders of Wildlife**, 504 U.S.560 (1992) (noting that an injury is a required element of constitutional standing))....].

107.    The HAMP-less Gang has paid bribes to South Carolina government employees to institute and maintain their illegal foreclosure litigations;

a.    The HAMP-less Gang improper and illegal acts have caused Plaintiffs to live in a hostile and unsafe environment – thus causing Plaintiffs to extricate themselves from South Carolina.

108.    The HAMP-less Gang implemented the illegal foreclosure suit to steal Plaintiffs' $1 million home. The described illegal actions are instituted against Plaintiffs based on their RACE: BLACK, and those similarly situated by said race.

**COUNT V - Maryland Consumer Protection Act**
[MD. COM. LAW CODE ANN. §§ 13-101 to -501 (1975 & Cum. Supp. 1979); Maryland General Business Law]

109.    Plaintiffs aver and replead paragraphs 96-109.

**PRAYER FOR RELIEF**

**WHEREFORE,** the Plaintiffs respectfully request the following relief:

A.    Enter a declaratory judgment in favor of Plaintiffs that Defendants have violated US Supreme Court decisions;

B.    Enter a declaratory judgment declaring and decreeing Plaintiffs have a constitutional right to live without fear of the HAMP-less Gang. AND, the illegal conduct of the HAMP-less Gang having caused Plaintiffs unsafe environment shall form the basis for compensating Plaintiffs' relocation.

C.    Certify this case as a class action and appoint the named Plaintiffs to be class representatives for each class for which they are designated and their counsel of choice to be class counsel;

D.    Enter a judgment declaring the acts and practices of BOA complained of herein to constitute fraud, conspiracy, and racketeering; together with an award of monetary damages and other available relief on those claims;

E.    Grant a temporary and/or permanent or final injunction enjoining BOA's and/or HAMP-less Gang, their agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Classes: that all litigation shall be stayed pending the outcome of this case;

F.    Order the HAMP-less Gang to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

G.    Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

H.     Award Plaintiffs an amount to be proven at trial, but not less than One-Hundred Million

($100 Million) Dollars;

I.     Treble damages and the cost of the suit, including attorneys' fees, pursuant to 18 U.S.C. §

1964(c), and the laws of Maryland;

J.     Plaintiffs demand trial by jury on all issues permitted by law; and

K.     Grant Plaintiffs and the Classes such other and further relief as this Court deems just and

proper.

M. Eugene Gibbs, Pro-se
4257 Monterey Drive
Florence, SC 29501
mgibbs70@aol.com
(843) 610-0674


Barbara A. Gibbs, Pro-se
3108 Hidden Falls Drive
Buford, Georgia 30519
mgibbs70@aol.com
(843) 610-0674